**IN THE DISTRICT COURT FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

**BENJAMIN WARREN HUDSON, JR., a minor, by and through his natural father and next friend DR. BENJAMIN HUDSON; ELI JAX PITALO, a minor, by and through his natural father and next friend GEORGE "TRAE" PITALO, III; and MORGAN SEYMOUR, a minor, by and through his natural father and next friend MICHAEL SEYMOUR** — **PLAINTIFFS**

**v.** — **CAUSE NO.** 1:26cv292 TBM-RPM

**TERRELL ELDORADO OWENS, an individual** — **DEFENDANT**

---

**COMPLAINT**

---

**Trial by jury demanded**

Plaintiffs, BENJAMIN WARREN HUDSON, JR. (hereinafter "Warren"), a minor, by and through his natural father and next friend Dr. Benjamin Hudson; ELI JAX PITALO (hereinafter "Jax"), a minor, by and through his natural father and next friend George "Trae" Pitalo, III; and MORGAN SEYMOUR (hereinafter "Morgan"), a minor, by and through his natural father and next friend Michael Seymour, by and through their counsel J. Tyler Cox and Edward Andrew Paltzik,[1] bring this action against Defendant TERRELL ELDORADO OWENS (hereinafter "Owens"), and allege as follows:

## INTRODUCTION

1. Defendant Owens excels at attracting attention to himself, often for the wrong reasons; he is best known for his flamboyant celebrations after scoring touchdowns and divisive locker room behavior during his pro football career. Owens has once again attracted attention to

[1] *Pro hac vice* application forthcoming.

himself for all the wrong reasons. This action concerns his devastating and far-reaching defamatory statement about Plaintiffs in a false and malicious social media post published by Owens on *X.com*:




Terrell Owens, (@terrellowens) X, (Sept. 26, 2026 at 12:15 a.m. CDT),[2] https://x.com/terrellowens/status/2103714990708719768 (last visited Oct. 4, 2026) (the "Defamatory X Post" or the "X Post") (**Exhibit A**).

2. The Defamatory X Post contained Owens' own statement "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!" directly above a link to a defamatory Instagram video (the "Trent Out Loud Video") with a photo of Warren, Jax, and Morgan (left to right), originally

[2] All times referenced herein are Central Daylight Time.

disseminated by notorious Canadian conspiracy theorist, race grifter, and failed footwear entrepreneur Trent Hall, who goes by the online moniker "Trent Out Loud" (https://www.trentoutloud.com; X: @TrentOutLoudTV; Instagram: @trentoutloud and @thetrentoutloudshow; YouTube: @trentoutloud). The X Post is not only defamatory on its face, but also as a full-throated endorsement of the defamatory Trent Out Loud Video.

3. The Defamatory X Post and the Trent Out Loud Video both relate to the tragic and highly publicized death of Plaintiffs' dear friend Nolan Xavier Wells ("Nolan") at Horn Island (the "Island"), Jackson County, Mississippi, on or about July 4, 2026. Nolan's death was accidental and involved no criminal activity. Yet, since that fateful and tragic day, conspiracy theorists, grifters, hoax peddlers, and other modern-day hucksters and plain liars have perpetuated the disgusting and false narrative that Warren, Jax, and Morgan somehow murdered Nolan and covered up this supposed heinous crime. These bad actors have acted on a variety of motives, including their need to identify and attack Girardian scapegoats, to garner social media clicks for profit and, in some instances, outright racism. Owens is one such bad actor, and one of the most famous such individuals.

4. The Trent Out Loud Video linked by Owens and endorsed by Owens with his added defamatory statement, "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!", contained Trent Out Loud's defamatory conspiracy theory that Plaintiffs murdered Nolan and then tampered with Nolan's phone after his death to cover up their role in supposedly murdering Nolan.

5. The full transcript of the Trent Out Loud Video reads as follows:

> Arrest Nolan's former friends, the three white boys, immediately! Warren, Jax, and Morgan! We now have probable cause! And while you're arresting them, also arrest the Mississippi DA, she knows they deleted things off of Nolan's phone, that is probable cause. Arrest them all immediately! Attorney Benjamin Crump just held a press conference in Florida at the offices of a digital forensic facility, headed by Andrew Garrett, one of the leading digital forensic inspectors in the country, and it

> was confirmed that there was deletions off of Nolan Xavier Well's phone. I am going to break down every single thing that went on at this press conference, I'm gonna show you clips from this press conference, but the only thing that you need to take away, I shouldn't say the only thing, the most important thing that you need to take away is that there were things deleted off of Nolan Xavier Wells' phone after he locked his phone, after he passed away. That's exactly what Christine and Elmore and Benjamin Crump told you guys, told all of us, days after Nolan was found, and there has been a plethora of people that have accused Christine and Elmore and Ben of lying, and now today we have proof, we have been vindicated. Two days ago, when the Mississippi DA came out and told us there was no bill, the Grand Jury found no reason to indict anybody, I told you guys, I came up on my channel, and I told you guys do not give up hope, and this is the reason why. Because I knew what Ben and Christine and Elmore were about to do.

TrentOutLoud, (@thetrentoutloudshow) Instagram, (Sept. 25, 2026), https://www.instagram.com/reel/Ddtm3N6xIHk/ (last visited Oct. 4, 2026) (captioned "Nolan Xavier Wells, parents, Christine and Elmore have been vindicated. They told y'all early on that somebody deleted things off of Nolan's cell phone. ARREST THE 3 WHITE BOYS & THE DA, EXPEDITIOUSLY").

6. The first segment of the Trent Out Loud Video appeared as follows:




7. Hence, as Owens well knew would be the case, being an experienced user of X, when he linked and therefore endorsed the content of the Trent Out Loud Video and combined the

linked video with "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!" to make the Defamatory X Post, the photo of Warren, Jax, and Morgan (left to right) that clearly and indisputably identified them to Owens' enormous audience, was automatically included in the X Post.

8. By publishing the Defamatory X Post with his own original statement that endorsed the Trent Out Loud Video, Owens falsely accused and imputed to Plaintiffs extremely serious wrongdoing that constitutes multiple felonies under Mississippi law, including, but not limited to: Murder (Miss. Code Ann. § 97-3-19); Hindering prosecution in the first degree (Miss. Code Ann. § 97-9-105); and Tampering with physical evidence (Miss. Code Ann. § 97-9-125). By pairing Plaintiffs' photo with a demand for their immediate arrest, the Defamatory X Post also placed Warren, Jax, and Morgan before Owens' audience in a false light, as murderers and participants in a murder coverup who had escaped justice, that would be highly offensive to any reasonable person.

9. Contrary to Owens' Defamatory X Post, there was absolutely no evidence to prompt an arrest of the Plaintiffs because they had done nothing wrong, and there was no probable cause to arrest Plaintiffs because they had not committed a crime.

10. Owens published the Defamatory X Post with actual malice: as he well knew, on September 18, 2026, the Jackson County Grand Jury had returned a "No True Bill" with regard to Nolan's tragic death, with the decision being publicly announced on September 21, 2026, five days before the Defamatory X Post. Also on September 21, District Attorney Angel Myers McIlrath ("DA McIlrath") released a Facebook video about the "No True Bill" (the "McIlrath Video").

District Attorney Angel Myers McIlrath, Facebook, (Sept. 21, 2026), https://www.facebook.com/reel/1394444306203117 (last visited Oct. 4, 2026).

11. Given Owens' knowledge of the "No True Bill" finding, this was clearly a case in which Owens watched the "game film" but decided instead to ignore what his brain, eyes, and ears told him so he could run his own play; the exact type of behavior that made Owens such a divisive figure during his football days.

12. As stated in the Jackson County Grand Jury Report of September 14-18, 2026, Circuit Court of Jackson County, Mississippi, 19th Circuit Court District:

> The Jackson County Grand Jury was impaneled on April 20, 2026, reconvened on September 14, 2026, and adjourned on September 18, 2026. The Grand Jury finds that the death of Nolan Xavier Wells on or about July 4, 2026, in Jackson County, Mississippi, being of great public concern, is within the Grand Jury's investigative authority. The Grand Jury engaged in a thorough and complete investigation into the death of Mr. Wells. Our sworn duty is to allow or deny issuance of an indictment. As the foreperson of the Grand Jury, *I report that the Grand Jury unanimously returns a No True Bill with respect to the death investigation of Nolan Xavier Wells*.
>
> Jackson County Grand Jury Report of September 14-18, 2026, Circuit Court of Jackson County, Mississippi, 19th Circuit Court District at 1 (Sept. 18, 2026), https://www.co.jackson.ms.us/DocumentCenter/View/1624/Redacted-Grand-Jury-Report (last visited Oct. 4, 2026) (emphasis added) (the "Grand Jury Report") (**Exhibit B**).

13. The harm to Plaintiffs' reputations because of the Defamatory X Post "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!" accompanied by a photo of Warren, Jax, and Morgan has been widespread; the X Post has received a staggering 140,000 views, 405 comments, 571 reposts, and 2,600 likes. This of course should come as no surprise, given that Owens, a six-time NFL Pro Bowl wide receiver and member of the Pro Football Hall of Fame, has over 1,200,000 followers on X plus another 627,000 followers on Instagram (@terrellowens).

14. Nolan Wells' accidental death at the Island was indeed a tragedy beyond measure. However, Warren, Jax, and Morgan played no role whatsoever in Nolan's tragic death. Any

accusations or suggestions that they murdered their dear friend or took steps to cover up his murder are categorically false and now an intentional lie.

15. Warren, Jax, and Morgan loved Nolan as a brother.



16. Owens, by knowingly peddling and perpetuating conspiratorial hoaxes and lies about Warren, Jax, and Morgan, has dishonored Nolan's legacy, forever shattered Plaintiffs' reputations, and severely endangered their physical safety.

17. Accordingly, Plaintiffs bring this action for defamation per se and false light to recover compensatory and punitive damages from Owens for the catastrophic reputational harm he has caused them, in an amount to be determined upon trial of this action.

## PARTIES

18. Plaintiff Warren, suing herein by and through his natural father and next friend Dr. Benjamin Hudson, is a citizen of the United States and a citizen of the State of Mississippi. Warren

is over the age of eighteen but under the age of twenty-one and is thus a minor under the laws of Mississippi.

19. Plaintiff Jax, suing herein by and through his natural father and next friend George "Trae" Pitalo, III, is a citizen of the United States and a citizen of the State of Mississippi. Jax is over the age of eighteen but under the age of twenty-one and is thus a minor under the laws of Mississippi.

20. Plaintiff Morgan, suing herein by and through his natural father and next friend Michael Seymour, is a citizen of the United States and a citizen of the State of Mississippi. Morgan is over the age of eighteen but under the age of twenty-one and is thus a minor under the laws of Mississippi.

21. Defendant, Owens, is a citizen of the United States and a citizen of the State of Nevada. Owens is a former wide receiver in the National Football League (NFL) who played 15 seasons between the San Francisco 49ers, Philadelphia Eagles, Dallas Cowboys, Buffalo Bills, and Cincinnati Bengals. Although Owens was inducted into the Pro Football Hall of Fame and ranks third in NFL career receiving yards and receiving touchdowns and was a six-time Pro Bowl and five-time first team All Pro selection, he was a highly controversial player known for dividing locker rooms, and ultimately never won a Super Bowl. Owens starred in the reality TV series "The T.O. Show" which ran on VH1 from 2009 to 2011 across three seasons and 27 episodes. Today, Owens maintains an active multi-platform social media presence where he shares fitness routines, NFL commentary, personal updates, and false and inflammatory takes on current events with his millions of followers.

**JURISDICTION AND VENUE**

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The parties are completely diverse, as Plaintiffs are citizens of Mississippi, while Defendant is a citizen of Nevada, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

23. "In a diversity action a federal court enjoys jurisdiction over a nonresident defendant to the extent permitted by the long-arm statute of the forum state." *Brown v. Flowers Industries, Inc*., 688 F.2d 328, 331 (5th Cir. 1982). Under the provisions of Mississippi's Long-Arm Statute, Miss. Code Ann. § 13-3-57, three activities permit Mississippi courts to exercise personal jurisdiction over a nonresident defendant. If that person has (1) entered into a contract in Mississippi; (2) has committed a tort in Mississippi; or (3) is conducting business in Mississippi. The Court possesses personal jurisdiction over Defendant Owens pursuant to the second prong, the tort prong.

24. "Under the tort prong of the Mississippi long-arm statute, personal jurisdiction is proper if any element of the tort (or any part of any element) takes place in Mississippi." *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997). "The tort is not complete until the injury occurs, and if the injury occurs in this State, then, under the . . . statute, the tort is committed, at least in part, in this State, and personam jurisdiction of the nonresident tort feasor is conferred upon the Mississippi court." *Smith v. Temco, Inc.*, 252 So. 2d 212, 216 (Miss. 1971); *see also Anderson v. Sonat Exploration Co*., 523 So. 2d 1024, 1025 (Miss. 1988). Even a single telephone call can give rise to personal jurisdiction in Mississippi. *See Brown*, 688 F.2d at 332 ("In this case jurisdiction was predicated on one long-distance telephone call that was alleged to constitute a tort 'committed in whole or in part' in Mississippi."). "Both by its language and by interpretation, the

statute includes in its reach defendants who commit a single tort." *Id.* at 333. Moreover: "An alleged tortfeasor need not have been present in the state. If, as is alleged in this case, he causes injury in Mississippi, he is covered by the statute." *Id.*; *Smith*, 252 So. 2d at 216.

25. Here, Owens aimed the Defamatory X Post at three citizens of Mississippi (all three Plaintiffs) about events that occurred exclusively in Mississippi (the tragic death of Nolan Wells at Horn Island) with the goal of causing Plaintiffs to be arrested and prosecuted in Mississippi, and thus expressly aimed the X Post at Mississippi in all respects. Owens therefore knew that his X Post would have an impact on Plaintiffs in Mississippi. *See Allred*, 117 F.3d at 286. Therefore, exercise of personal jurisdiction over Owens is appropriate and necessary.

26. In addition to Owens' purposeful targeting of three Mississippi citizens, he also traveled to Mississippi multiple times in the aftermath of Nolan's tragic death to fan the flames of anger and outrage against Plaintiffs and other innocent bystanders. One such example was when Owens, who had no relationship whatsoever with Nolan, attended Nolan's funeral on July 20, 2026 at Center Pointe Church in Ocean Springs, Mississippi.

27. Venue is proper in this district under 28 U.S.C. § 1391(b)(2). A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District: Nolan's tragic death occurred in this District, Plaintiffs were injured by Owens' Defamatory X Post in this District, the investigation into Nolan's tragic death and related Grand Jury proceedings occurred in this District, and thousands of residents of this District read Owens' X Post. In addition, the Defamatory X Post serves to accuse Plaintiffs of having committed at least one crime in the State of Mississippi.

## **<u>FACTUAL ALLEGATIONS</u>**

### ***<u>The Defamatory X Post</u>***

28. The Defamatory X Post was published by Owens on X.com on September 26, 2026 at 12:15 a.m. CDT. Terrell Owens, (@terrellowens) X, (Sept. 26, 2026 at 12:15 a.m. CDT), https://x.com/terrellowens/status/2103714990708719768 (last visited Oct. 4, 2026) (**Exhibit A**).




29. Crucially, the Defamatory X Post *was not a repost*, the X Post was an independent post containing a link to the Trent Out Loud Video on Instagram as well as Owens' *own original*

*statement* "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!" accusing Plaintiffs of committing infamous crimes *and* endorsing the content of the Trent Out Loud Video itself, with the inclusion of Plaintiffs' photo to ensure that they would be identified. The sum total of Owens' X Post, then, was (a) his own statement "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!" asserting that there was probable cause to arrest Plaintiffs for multiple infamous crimes that they did not commit, when in fact there was no probable cause whatsoever for their arrest; (b) his endorsement of the Trent Out Loud Video and its defamatory content by providing a link to same; (c) the combined effect of (a) and (b) together to provide the audience with the full context of the X Post and Owens' actual malice; and (d) the photo of Warren, Jax, and Morgan to ensure that Owens' audience would be able to identify the target of his defamation, placed directly below Owens' own original statement and above the abhorrent and wildly false Trent Out Loud Video that was linked and endorsed by Owens.

30. As Trent Out Loud himself stated in a subsequent video: "Breaking news. NFL Hall of Famer Terrell Owens is the latest person to receive a defamation lawsuit from Nolan's former friends, these three white boys . . . And what did Terrell do to defame the three white boys? He reposted one of my reels where I said we now have probable cause to arrest the three white boys immediately! *And Terrell simply agreed with me*." TrentOutLoud, (@thetrentoutloudshow) Instagram, (Sept. 28, 2026), https://www.instagram.com/p/Dd2NnsNxXQM/ (last visited Oct. 4, 2026) (emphasis added). Trent Out Loud, who is almost always lying or simply wrong, was in this one instance, correct. Owens *did* agree with Trent that there was probable cause to arrest Warren, Jax, and Morgan, which was false and defamatory since there was no such probable cause and never any probable cause, as evidenced by the "No True Bill."

***The True and Accurate Timeline of Events on July 4, 2026***
***<u>at Horn Island, Mississippi Prior to Nolan's Tragic Death</u>***

31. The facts as they pertain to Warren, Jax, and Morgan are straightforward. They arrived on Horn Island at approximately 10:50 a.m. on July 4, 2026, as part of a large, mixed-race, and tight-knit Ocean Springs friend group traveling together with others in three boats.




32. Nolan was aboard the *Triton* with 8 other friends. Morgan was on the *Palm Beach* with 3 other friends. Warren and Jax were on the *Tideline* with 15 other friends. The boating party consisted of 30 individuals in total. At no time on the way out to the Island were Warren, Jax, or Morgan on the same boat with Nolan.

33. Further, none of these boats were or are owned by Warren, Jax, or Morgan, nor by their families. The below picture illustrates that this was a large group that went with them to Horn Island.



34. At the time Nolan was last seen on the Island by anyone in the boating party, there were approximately 2,000 people there enjoying Independence Day. Below are two pictures showing the sheer amount of people on the Island just in the far northwest portion.






35. Nolan and his friends spent their time on Horn Island socializing and drinking alcohol. At no time while Warren, Jax, and Morgan were on the Island were they alone with Nolan. By all accounts, while Warren, Jax, and Morgan were on the Island, Nolan was at no point in time alone. Nolan was never in distress, hurt, injured, or in any physical danger in the slightest while Warren, Jax, and Morgan were there.

36. Nolan, just like most everyone on the Island, did not have his phone in his pocket the entire day. Just the opposite. On the Island, it is normal for an individual to store his or her cell

phone and electronics on the boat so that it will not be damaged by the salt water. Further, the water is so murky that if a phone is dropped it is almost impossible to retrieve it.

37. While Warren, Jax, and Morgan were there, Nolan seemed in good spirits and enjoying Independence Day. Below are pictures of Nolan amidst a large group of young people at approximately 1:55 p.m. The first picture is a close-up of Nolan from the second picture.






38. At approximately 3:00 p.m., Warren saw Nolan alive and well wading in the water with a young woman, holding each other. Nolan appeared happy and enjoying himself with the young woman, with whom he spent much of the day. This marks the last time Warren personally saw Nolan, although others in the group saw him at the time of the group's departure from Horn Island.

39. By the time Owens endorsed the defamatory statements and called for the arrest of these innocent young men, it was common knowledge that Warren, Jax, and Morgan then left Horn

Island with a large group of friends (27 in the departing boating party in total) at approximately 4:28 p.m., all while Nolan was alive and well.

40. The 4:28 p.m. departure is also confirmed by numerous witnesses, who can also confirm that Nolan decided to remain on the Island and did not leave with Warren, Jax, and Morgan. Nolan did not retrieve his phone from the boat.




41. The *Palm Beach* (carrying 3 individuals, including Morgan) left first. The *Triton* (carrying 8 individuals including Warren) and the *Tideline* (carrying 16 individuals including Jax) departed shortly thereafter. Nolan was *not* one of the 27 members of the return boating party.

42. However, the departure was not without complication: one of the boats, the *Triton*, was taking on water due to a defective bilge pump.

43. Multiple people told Nolan to get on the boat, but he wanted to stay on Horn Island with the young woman he was spending the day with. Nolan chose, of his own free will and accord, to stay on the Island and return home later. He was not the only friend to stay later than the larger group.

44. Due to the danger of the *Triton* sinking, the group unanchored the boat and slowly moved away from the Island while trying to get assistance.

45. At approximately 4:48 p.m., a member of the group called Sea Tow due to the bilge pump issue. Below is a picture taken of that individual while on the phone with Sea Tow at 4:48 p.m. on July 4, 2026, just off of the shore of the Island.






46. Sea Tow ended up not towing the *Triton*, but instead the group decided that the *Tideline* would be best suited to tow the boat.






47. It took approximately an hour and a half to return to the mainland, with the *Tideline* towing the *Triton*, due to this mechanical issue.

48. Halfway home, the motor of the *Triton* was able to trim down, electrical equipment regained function, and the group was able to remove the plug on the boat so that excess water would expel out of the back of the boat when it gained enough speed. At approximately 6:01 p.m.,

the group of three returning boats docked back on the mainland. Nolan was not on any of these three boats.

49. Between the *Triton* and the *Tideline*, there were 24 occupants, and thus 24 witnesses. None of these 24 individuals saw Nolan in either boat because Nolan was not in either boat. Every one of these witnesses have spoken to authorities and verified that Nolan was not on either of the boats when they returned to the mainland. *Nolan was simply not in the boats*, because *he voluntarily remained on the Island*.






50. Later that night, the friend group became alarmed and concerned when they realized none of them had heard from Nolan. By approximately 10:00 p.m., members of the group,

including Warren, Jax, and Morgan, began contacting mutual friends to locate Nolan. None had heard from him or knew his whereabouts.

51. At approximately 11:07 p.m., Warren personally telephoned Christine Wells ("Christine") to ask whether Nolan had returned home. Warren told Christine that Nolan did not return with the group and Christine confirmed that he had not returned home, and she had not heard from Nolan since the evening of July 3. Warren advised her that Nolan's cell phone had remained with the group on their return from the Island and was secured in Wyatt Pyron's vehicle. Warren also told Christine that he would call the Coast Guard out of an abundance of caution.




52. Moreover, at approximately 11:13 p.m., Warren personally contacted the United States Coast Guard to report Nolan missing and get help locating him. Warren remained on the call for over twenty minutes and provided a full description of Nolan, what he was wearing, his

last known whereabouts, what time the friend group left the Island, and other necessary information to help find him.







53. While Warren was on the phone with the Coast Guard, he and Christine were constantly exchanging text messages, starting at 11:15 p.m.


342
C
Christine Wells
iMessage
Sat, Jul 4 at 11:15 PM
Warren where is his car?
At jax's house
Where is that?
Can you send me the address where you guys launched?
Yes ma'am
What time was the last time you guys saw him?
3 PM
Marked Location
Marked Location
iMessage


12:11
342
C
Christine Wells
Yes ma'am
What time was the last time you guys saw him?
3 PM
Marked Location
Marked Location
Fort Bayou Boat Ramp
Ocean Springs MS 39564
United States
Maps
What was he wearing
Black shorts and sunglasses
Christine Wells unsent a message
Can you call Neva at DMR
iMessage


12:11
342
C
Christine Wells
Maps
What was he wearing
Black shorts and sunglasses
Christine Wells unsent a message
Can you call Neva at DMR
REDACTED
On the phone with coast guard now
I will after yes ma'am
Thank you so much
We have to file a missing persons report. So one more time tell me exactly where you saw him last. I'm so sorry I am asking you to repeat this.
Edited
3 PM, west tip, north side of horn island
Where did you guys launch from?
iMessage


12:11
342
C
Christine Wells
REDACTED
Marked Location
REDACTED
Ocean Springs MS 39564
United States
Maps
We launched the boats yesterday evening and left from here this morning
Sun, Jul 5 at 2:24 AM
Nolan's dad is at the house to pick up the key
Sun, Jul 5 at 1:02 PM
Hey Warren,
What kind of sunglasses was Nolan wearing yesterday?
iMessage


12:07
343
C
Christine Wells
Marked Location
REDACTED
Ocean Springs MS 39564
United States
Maps
We launched the boats yesterday evening and left from here this morning
Sun, Jul 5 at 2:24 AM
Nolan's dad is at the house to pick up the key
Sun, Jul 5 at 1:02 PM
Hey Warren,
What kind of sunglasses was Nolan wearing yesterday?
I'm pretty sure raybands Mrs. Christine
Sun, Jul 5 at 5:15 PM
Hey Mrs. Christine, just wanted to check in. We went out this morning to look, and I've been on and off the phone with Jackson
iMessage


12:11
342
C
Christine Wells
Sun, Jul 5 at 5:15 PM
Hey Mrs. Christine, just wanted to check in. We went out this morning to look, and I've been on and off the phone with Jackson County Sheriffs office today. If you need anything at all please don't hesitate to reach out.
Thank you
We are all praying for your family.
We appreciate it
Sun, Jul 5 at 8:35 PM
What is the make and model of boat your guys were on
Nolan went out on a 22 triton offshore. I was on a 24 tideline on the way out. We were on seperate boats. I went back on the triton. DMR and the Sheriffs office has all this information also.
Mon, Jul 6 at 1:37 PM
iMessage

54. One minute after getting off the call with the Coast Guard, Warren called Christine again to inform her that he spoke to them and that they were notified. He also told her the details about where the group was on the Island, where they last saw Nolan, and other relevant information. At 12:25 a.m., Warren received a call from a local member of the Coast Guard to get more information about Nolan and his last known location. Warren again willingly provided them all the information he had.






55. To count: two calls to Christine and two times speaking with the Coast Guard. Then, at 1:00 a.m. on the dot, Christine and Warren talked for a third time. This time, Christine called Warren. She told him that Jackson County Sheriff's Department would be calling him so that he could give them more information. Warren agreed and spoke with a Deputy or Investigator on another individual's phone.




56. As a matter of common sense, if an individual had just committed a heinous and infamous crime on an island, calling and texting the victim's mother, calling the fine men and women of the Coast Guard with their marine investigative expertise, and then speaking to the Jackson County Sheriff's Department, would be highly inadvisable.

57. Just after midnight on July 5, Jayvon Williams' mother arrived at Jax's house unannounced with a group of people, most of whom were unknown to Warren, Jax, and Morgan. These individuals let themselves into the house without permission, demanding Nolan's cell phone and his whereabouts. Jax's parents were not home.

58. A female friend retrieved Nolan's cell phone from Wyatt Pyron's truck and handed it to Jayvon's mother without incident or delay. At no time did Warren, Jax, or Morgan so much as touch Nolan's phone. At no time did they have actual possession of Nolan's phone. At no time

did they have constructive possession of Nolan's phone. At no time did they access or breach his phone. And at no time did they alter, delete, modify, or erase any data or information on Nolan's phone.

59. Then, after 2:24 a.m. on July 5, Nolan's stepfather, Elmore Wonsley, came to Jax's house and asked Jax whether he had possession of Nolan's keys. Nolan spent the night at Jax's house on July 3 into early July 4 with around 15 to 20 other people. He even slept in Jax's bed with Jax having to find another place to sleep. After searching throughout his residence, Jax was unable to immediately locate Nolan's keys, because Nolan hadn't told Jax where he had left them. Another individual who was with Elmore had to text the same female friend who handed the phone to Jayvon's mother to find out where Nolan left his keys. It turned out that Nolan had left the keys on top of a video game console in Jax's bedroom. Jax immediately handed over the keys to Nolan's stepfather.

60. But Elmore wasn't alone. There were a group of other individuals with him. After giving Nolan's keys to Elmore, the group with him refused to leave the property. Even when asked to leave by Jax and his brother, the group remained there and demanded answers as to Nolan's location. The group became disruptive. After refusing to leave repeatedly, Jax and his brother finally had to call 911.




61. Once the Ocean Springs Police Department arrived on scene, the group finally left the property, and Jax and his brother told police about Nolan not returning with them. They told

officers truthfully that no one had seen him, and that unruly group came to their house to locate Nolan's keys and demand answers from them.

62. Later that day, at approximately 10:30 a.m. on July 5, Warren, together with Katie Hudson Seymour, David Seymour, Brooks Edmiston, and Jax, returned to Horn Island by boat to search for Nolan. That search was subsequently joined by units of the Mississippi Department of Marine Resources, helicopters, fixed-wing aircraft, and additional private vessels. Neither Warren, Jax, nor Morgan has any knowledge of what happened to Nolan after his last confirmed sighting on the Island, and none of them had any involvement whatsoever in his disappearance or death.

63. Again, it bears repeating: neither Warren, Jax, nor Morgan at any time had possession of or made any false statement regarding Nolan's cell phone. Neither Warren, nor Jax, nor Morgan breached, accessed, tampered with, or deleted any data from Nolan's cell phone. None of them hid, concealed, nor withheld Nolan's keys or lied about the whereabouts of Nolan's keys. And they absolutely came forward and made numerous diligent efforts to increase the probability of locating Nolan.

64. Without the assistance of Warren, Jax, and Morgan, the investigation into Nolan's whereabouts would not have started as soon as it did, and the public would have been further from getting to the truth.

65. Moreover, the northwestern tip of Horn Island, where Warren, Jax, Morgan, Nolan, and their friends enjoyed Independence Day, is flat with low sand dunes, and no visual obstructions, and is extremely narrow north to south.



66. With thousands of people present during daylight hours on Independence Day, any assertion that an unwitnessed murder occurred under a bright sun and cloudless sky is not only fundamentally inconsistent with the facts set forth above, but also improbable.

***<u>The Grand Jury Report</u>***

67. The Jackson County Grand Jury was impaneled on April 20, 2026, reconvened on September 14, 2026, and concluded the session described in the Grand Jury Report on September 18, 2026. The April date is when the Grand Jury was impaneled, not the date of Nolan's death or the commencement of the death investigation. The Grand Jury Report was filed on September 18, 2026. DA McIlrath publicly announced the decision in the McIlrath Video, concurrent with the release of the Grand Jury Report on September 21, 2026. **Ex. B** at 1; McIlrath Video.

68. At the time Owens published the Defamatory X Post, Owens was fully aware of the Grand Jury Report and its contents.

69. Notably, the Grand Jury was racially and otherwise biographically diverse. Originally consisting of 25 individuals "from a cross section of citizens of Jackson County, Mississippi" the panel was ultimately reduced to 23 individuals when two Grand Jurors were excused for personal reasons. **Ex. B** at 1. The 23 Grand Jurors that ultimately heard the matter ranged in age from 27 to 68 years of age and included 13 males, 10 females, 12 Caucasians, 5 African Americans, 1 Asian, 2 Hispanics, 2 Native Americans, and 1 who preferred "other" as to describe them. *Id*. at 1.

70. The Grand Jury issued 132 subpoenas and heard from 43 witnesses. It had full and open access to the complete Jackson County Sheriff's Department investigative file, including materials from assisting agencies. *Id*. at 2-3.

71. The materials considered included witness testimony, physical and digital evidence, investigative reports, interviews and recorded statements, images, videos, maps, GPS and location data, cellphone extractions, and responses to subpoenas duces tecum. The Grand Jury also considered the family's preliminary and final forensic cellphone reports and a 261-page Snapchat Conversation Report. *Id*.

72. This diverse and thorough Grand Jury unanimously returned a "No True Bill" with respect to the death investigation of Nolan Xavier Wells, completely exonerating Warren, Jax, and Morgan: "The Grand Jury engaged in a thorough and complete investigation into the death of Mr. Wells. Our sworn duty is to allow or deny issuance of an indictment. As the foreperson of the Grand Jury, *I report that the Grand Jury unanimously returns a No True Bill with respect to the death investigation of Nolan Xavier Wells*." *Id*. at 1 (emphasis added).

73. The Grand Jury's factual findings were entirely consistent with the accurate account of events that Warren, Jax, and Morgan had conveyed repeatedly during the preceding months. Warren, Jax, and Morgan were required to make statements because of the unconscionable defamatory behavior of famous individuals such as Owens.

74. First: "The Grand Jury finds that Mr. Wells accompanied a group of friends to Horn Island on July 4, 2026. The group of friends traveled on three (3) different boats: the Triton, the Palm Beach, and the Tideline. Mr. Wells traveled to Horn Island on the Triton." *Id*. at 4.

75. Second: "The Grand Jury finds that Mr. Wells chose to remain at Horn Island on the afternoon of July 4, 2026, after the Triton, the Palm Beach, and the Tideline departed the island. Other individuals, including Mr. Wells, remained at the island to socialize." *Id*. at 5.

76. Third: "*The Grand Jury finds no credible evidence to support the public allegations that any persons who rode to or from Horn Island on July 4, 2026, on the Triton, the Palm Beach,*

*or the Tideline engaged in any criminal conduct related to the death of Mr. Wells*." *Id*. (emphasis added).

77. Fourth: "*The allegations against the occupants of the Triton, the Palm Beach, and the Tideline are not based in truth, and are solely the result of public clamor and private malice*." *Id*. (emphasis added).

78. Fifth: "Further, the public clamor and malicious allegations against the occupants of the Triton, the Palm Beach, and the Tideline have extended to their family members and friends." *Id*.

79. Sixth: "The Grand Jury finds that the public attacks on the occupants of the Triton, the Palm Beach, and the Tideline, as well as their family and friends, are malicious, false, and have no truth in fact or evidence." *Id*.

80. Seventh: "The Grand Jury recognizes that it is common for individuals visiting Horn Island to socialize on boats and in the water. The Grand Jury finds that it is not unusual or suspicious for individuals to return from the island on boats they did not travel to the island on; nor is it unusual for individuals to place their phones and personal items on other boats they visit and socialize on. The Grand Jury finds that Mr. Wells' phone was not the only phone to travel back to the mainland without its owner." *Id*.

81. Eighth: "The Grand Jury finds that Mr. Wells purchased his alcohol with his fake identification card." *Id*.

82. Ninth: "The Grand Jury finds that the Triton had a bilge pump and motor malfunction on July 4, 2026, and was actively taking on water and sinking. The Grand Jury finds that the Triton was towed for a short distance by the Tideline allowing the water to drain from the boat interior while a passenger manually held the motor trim button down." *Id*. at 6.

83. Tenth: "The Grand Jury recognizes there have been public assertions that Mr. Wells was the only African American individual on Horn Island on July 4, 2026. The Grand Jury finds that Mr. Wells was not the only African American on Horn Island that day. These false assertions have led to misidentification, speculation, and rumors concerning the death of Mr. Wells." *Id*.

84. Eleventh: "The Grand Jury finds that GPS data and security footage confirm the accounts of the passengers on the Triton, Palm Beach, and Tideline." *Id*.

85. Twelfth: "The Grand Jury finds that the individuals who traveled to or from Horn Island on the Triton, Palm Beach, and Tideline cooperated fully with this investigation, including offering marine GPS devices, surveillance footage, cell phones, and statements to law enforcement officers and Mr. Wells' family during this investigation." *Id*.

86. Thirteenth: "The Grand Jury finds that the position of, the condition of, time of discovery, and location of Mr. Wells' body is consistent with drowning." *Id*.

87. Fourteenth: "The Grand Jury finds that Mr. Wells chose to remain on Horn Island after the boat he arrived on departed, which is common for visitors to Horn Island on holidays and other crowded days." *Id*.

88. Fifteenth: "The Grand Jury conducted a comprehensive inquiry into the death of Mr. Wells and is confident in the extensive investigation done by both Federal and State law enforcement agencies." *Id*.

***The McIlrath Video***

89. The McIlrath Video, based on the Grand Jury Report, was an unprecedented step made necessary because of repeated baseless accusations of bias and misconduct made against DA McIlrath by well-known racial instigator Ben Crump, attorney for Nolan's family. (Transcript of McIlrath Video, **Exhibit C**).

90. At the time Owens published the Defamatory X Post, Owens was fully aware of the McIlrath Video and its contents.

91. DA McIlrath's findings were entirely consistent with not only the Grand Jury Report, but also the accurate account of events that Warren, Jax, and Morgan had conveyed repeatedly in public statements during the preceding months.

92. First: "Jackson County, after a thorough and exhaustive investigation, your grand jury met last week concerning the death investigation of Nolan Wells and unanimously returned a no true bill."

93. Second: "The narrative that three white boys and a black boy went to an island and only three white friends returned spread like wildfire. This was false."

94. Third: "Nolan went to Horn Island on July 4, 2026, with a large group of friends, and while on the island, he connected with even more friends. There is absolutely no evidence to support the allegations that Nolan's disappearance and death were racially motivated. Nolan's friends love Nolan. And Nolan loved them."

95. Fourth: "Nolan chose to stay on the island that day, and there is not a scintilla of evidence to contradict that. The family, the Crump team, and anyone close to Nolan knew that his disappearance and death were not the result of racial hate or violence. Yet the flames of that narrative, set against the backdrop of Mississippi's terrible history, were fanned by both people who knew the truth and those who didn't."

96. Fifth: "What I cannot accept, and when I cannot ignore, is that false narratives that Nolan's death was somehow racially motivated and that this is a case of another young black man denied justice by a racist, corrupt system, were perpetuated and allowed to spread. There is not a shred of evidence to support these narratives. Keep in mind all that has transpired publicly as you

review the grand jury report in the correspondence I'm releasing in conjunction with this statement."

97. DA McIlrath also confirmed perhaps the most shocking fact of the entire investigation into Nolan's tragic death: Ben Crump and his team never turned Nolan's phone over to law enforcement.

98. As DA McIlrath stated of Ben Crump's shocking hypocritical failure to turn in Nolan's cell phone, which contradicted his fake calls for transparency:

> One of the most prevalent false narratives was that my office refused to cooperate and or obstructed a mutual examination with the Crump team of Nolan's cell phone. This could not be further from the truth. You must first understand that the state of Mississippi had no legal avenue to seize and search Nolan's cell phone. *Nolan's family received that phone in the very early morning hours of July 5th, and it continues to remain in their possession.* Nolan's family and the Crump team have always been in complete control of Nolan's cell phone, including when, where, how, and if the phone would be examined by the state. During our July 15, 2026, meeting, I accepted the Crump team's offer to participate in a mutual examination of Nolan's cell phone. I remained willing to do so and agreeable to any conditions the family wished to impose. Again, this truth about Nolan's phone was not shared with the public. When the extraction did not happen within a reasonable time, I reached out to get the ball rolling. We could not wait on the Crump team. I could not allow this investigation to be delayed especially as tensions rose, false information exploded, and threats and harassment continued to escalate. Unbeknownst to me, the family was out of town at that time. Their attorneys reached out, and we subsequently set up a time and place for an extraction to occur. On the morning of the agreed upon extraction date, our law enforcement investigators were contacted by privately retained examiners with Garrett Discovery Inc. advising that the mutual phone extraction would not occur, as they had begun a private extraction the evening prior and it was incomplete. I respected the family's decision for a private examination and requested that they share those results with my office. On August 28, 2026, the Crump team advised that I would receive the extraction data by FedEx within 48 hours and provided a 14-page Preliminary report indicating the phone had not been accessed by anyone other than Nolan's family, and nothing had been deleted off of the phone since Nolan's last use. *I never received the full extraction data as promised, and I never received a complete extraction report of Nolan's cell phone*.
>
> (Emphasis added).

99. DA McIlrath did not mince words. Ben Crump and his team lied to DA McIlrath and the public and did so repeatedly. Owens knew this to be the case at the time he published the Defamatory X Post. As DA McIlrath stated:

> My abiding by the law and not releasing the autopsy and toxicology results to the public in no way impeded Nolan's family or the Crump team from obtaining the results and a copy of the results pursuant to the law. Here again, another narrative allowed to flourish when my hands were tied in responding. The Crump team knew better but allowed the public to believe, among other false narratives, that our medical examiner withheld Nolan's lungs and stomach when his body was released, that things had been deleted off of Nolan's phone before it was given back to his family, that I refused to cooperate with the examination of Nolan's cell phone, that I refuse to provide Nolan's autopsy results to the family. *All lies, and they knew it.*

(Emphasis added).

***<u>Owens' Fault for the Defamatory X Post</u>***

100. DA McIlrath in her Video captured the devastating impact that celebrities, influencers, and provocateurs such as Owens, who don't care about the truth, have had on Warren, Jax, and Morgan:

> Today, anyone with an internet connection can become an influencer, take fragments of information, construct a narrative without context or firsthand knowledge and broadcast it to thousands or millions of people with little or no responsibility to the truth or consequences for what they do. Likes, shares, follows, subscriptions, and dollars have become more important than the truth. There was a time when having a public voice came with responsibility and having to earn your place on the platform. Journalists were expected to be knowledgeable about the subjects they covered, to investigate before they reported, to distinguish fact from speculation, and to pursue the truth without regard to narrative that might generate the most attention.

101. Owens was most definitely one such individual who knowingly relied on "fragments of information" to fan the flames of the false, malicious, and defamatory narrative about Warren, Jax, and Morgan fabricated by Ben Crump and his team, while realizing perfectly

well that the narrative was false or, at a minimum, made with reckless disregard for the truth. This was particularly so regarding the Defamatory X Post.

102. Owens' actual malice is obvious and plain for the world to see in that he called for Plaintiffs' arrest and thereby asserted that there was probable cause for such arrest, *well after* the issuance of the publicly available Grand Jury Report and the McIlrath Video.

103. Thus, Owens had access to and was fully aware of publicly available information from a *Grand Jury and a District Attorney* that directly contradicted his false statement. Indeed, the linked Trent Out Loud Video in the Defamatory X Post explicitly references and discusses the Grand Jury Report and District Attorney McIlrath. Owens not only viewed the Trent Out Loud Video, he endorsed the contents of same.

104. Owens' actual malice is also painfully clear in that he amplified and augmented the outrageous lies of a notorious conspiracy theorist and hoax peddler, Trent Out Loud, who had by that point published literally hundreds of lies about Plaintiffs, and who is being sued in a forthcoming separate action brought by Warren, Jax, and Morgan for such poisonous lies.

105. However, since Warren, Jax, and Morgan are private individuals and not public figures or even limited purpose (vortex) public figures, the correct standard of fault is not actual malice, but the lower standard of negligence.

***Damages***

106. Since its publication, the Defamatory X Post has gained substantial traction and republication across various media.

107. The Defamatory X Post has received a staggering 140,000 views, 405 comments, 571 reposts, and 2,600 likes. This was to be expected, given that Owens, a six-time NFL Pro Bowl

wide receiver and member of the Pro Football Hall of Fame, has over 1,200,000 followers on X plus another 627,000 followers on Instagram (@terrellowens).

108. The scale and scope of the harm inflicted by Owens upon Warren, Jax, and Morgan is almost incomprehensible and utterly staggering. The full extent of their damages will be determined upon trial of this action.

109. But the damages that Warren, Jax, and Morgan have sustained go far beyond monetary harm. Due to the conduct of Owens and many other less-famous individuals, these completely innocent young men have been subjected to thousands of death threats, face-to-face harassment, and daily fear and ridicule from complete strangers. They've even been refused service at public establishments. Their lives, and the lives of their family members, will never be the same.

110. Moreover, Warren, Jax, and Morgan have suffered and sustained enormous emotional, mental, and psychological distress because of the relentless defamation perpetrated by Owens and others like him who seek to emulate the behavior of famous individuals with huge platforms.

111. Simply put, Owens and others like him have inspired widespread hatred and rage towards Warren, Jax, and Morgan to the point of endangering their lives and their families. This hatred and rage, as well as the constant threat of physical attack, have inevitably led each of the three Plaintiffs to experience ongoing emotional, mental, and psychological distress.

112. Owens' intended audience included not only good but impressionable people; he also intended to reach the many thousands of dangerous people who wish to bring physical harm upon Warren, Jax, Morgan, and their families. One such illustrative example is an individual who went by the username "its.jasminnicole" on Threads before her account was deactivated:


its.jasminnicole > Nolan Wells 4h
Do we have the boys' addresses? If so, it's time to show up to their homes. En masse. Legally take over all the surrounding areas of their property. They should need escorts to go to the grocery store. Their homes shouldn't feel safe. 1/2



1.5K 782 197 8

its.jasminnicole 3h
SHUT MISSISSIPPI DOWN! 2/2

200 3 1

113. This post, which used the same photo of Plaintiffs that Owens and Trent Out Loud used, and was made on September 26 after Owens' Defamatory X Post, was the exact type of depraved social media post that dangerous individuals had posted on an industrial scale prior to the Defamatory X Post, and the exact engaged and motivated audience Owens sought to reach with the X Post, with the goal of fomenting many additional threats of violence.

114. Because of the Defamatory X Post, many thousands of additional social media posts have been made by dangerous individuals seeking to incite violence against Warren, Jax, Morgan, and their families, exactly as Owens intended would happen.

115. Warren, Jax, and Morgan were all close with Nolan and loved him like a brother. And Nolan loved them back. Unlike Owens, Warren, Jax, and Morgan welcomed the truth and cared very much about learning the truth surrounding Nolan's tragic death. Baseless accusations such as the Defamatory X Post do not advance the investigation into Nolan's tragic death, nor do they honor his memory in the way that he deserved. Owens knew of this relationship, yet chose to disseminate lies to as wide an audience as possible.

## CLAIMS FOR RELIEF

### COUNT I – DEFAMATION *PER SE*
### *(All Plaintiffs v. Defendant Owens)*

116. Plaintiffs reallege their allegations contained in paragraphs 1 through 115 as if set forth fully below.

117. "Defamation is that which tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him." *Fagan v. Faulkner*, 396 So. 3d 1112, 1117 (Miss. 2024).

118. Under Mississippi law, the elements of defamation are: "(a) a false statement that has the capacity to injure the plaintiff's reputation; (b) an unprivileged publication, i.e., communication to a third party; (c) negligence or greater fault on the part of the publisher; and (d) either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Id*. (quoting *Speed v. Scott*, 787 So. 2d 626, 631 (Miss. 2001)); *Blake v. Gannett Co.*, 529 So. 2d 595, 602 (Miss. 1988).

119. A statement is considered false if it would produce "a different effect on the mind of the reader" than the undisputed truth would create. *Armistead v. Minor*, 815 So. 2d 1189, 1194 (Miss. 2002).

120. Ordinarily, defamation requires proof of "special harm" unless the statement is actionable *per se* (defamation *per se*). *Speed*, 787 So. 2d at 632.

121. Mississippi has five categories of defamation for which no special harm need be shown (defamation *per se*); one such category, relevant in this action, is "[w]ords imputing the guilt or commission of some criminal offense involving moral turpitude and infamous punishment." *Id.*

122. In Mississippi, an "infamous crime" is defined by statute as "offenses punished with death or confinement in the penitentiary." Miss. Code Ann. § 1-3-19; *see White v. Nationwide Mut. Ins. Co.*, 323 So. 3d 494, 496 n.1 (Miss. 2021). The Mississippi Supreme Court has interpreted this statutory definition to include all felonies. *Mauney v. State ex rel. Moore*, 707 So. 2d 1093, 1096 (Miss. 1998).

123. In Mississippi, Murder (Miss. Code Ann. § 97-3-19); Hindering prosecution in the first degree (Miss. Code Ann. § 97-9-105); and Tampering with physical evidence (Miss. Code Ann. § 97-9-125) and Conspiracy of same (Miss. Code Ann. § 97-1-1) are all felonies.

124. Owens' Defamatory X Post was intentionally, with actual malice, and without privilege, published to a substantial audience in the State of Mississippi and in this District, and elsewhere, by Owens, was false, and accused Plaintiffs of committing infamous crimes, thus constituting defamation *per se*.

125. As to the first element, falsity with capacity to injure, the Defamatory X Post, which stated "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!" was completely and undeniably false, in multiple respects: (1) Plaintiffs had been exonerated by the Grand Jury five days earlier, and thus there was no probable cause for them to be arrested for any criminal offense, felony or otherwise; (2) The Grand Jury had issued a finding of "No True Bill," a definitive

conclusion that no individuals, including Plaintiffs, had engaged in criminal conduct in connection with Nolan's tragic death; (3) Plaintiffs have not now or ever engaged in any conduct, let alone anything having to do with Nolan's death, that would rise to the level of an arrestable offense; and (4) Plaintiffs were completely innocent in connection with Nolan's tragic death. Moreover, the X Post had the capacity to injure, and clearly did injure Plaintiffs, as Owens' audience could not possibly have any doubt that Owens was referring to nothing other than Nolan's tragic death and the subsequent investigation of same when he stated "ARREST THEM IMMEDIATELY!! LIKE YESTERDAY!!" with a photo of Plaintiffs taken from the Trent Out Loud Video accusing them of infamous criminal conduct in connection with Nolan's tragic death.

126. There is no reasonable interpretation of the Defamatory X Post other than the inescapable reality: Owens was plainly accusing Plaintiffs of committing multiple infamous crimes in connection with Nolan's tragic death, plainly imputing infamous criminal conduct to Plaintiffs in connection with Nolan's tragic death, and plainly stating that there was probable cause to immediately arrest Plaintiffs in connection with Nolan's tragic death, even though the Grand Jury and DA McIlrath had issued the exact opposite legally binding conclusions.

127. As to the second element, unprivileged publication, the Defamatory X Post was published without any privilege of any kind to Owens' million plus followers.

128. As to the third element, fault, Owens' publication of the Defamatory X Post was, as set forth above, knowingly or recklessly made with disregard for the truth. However, Warren, Jax, and Morgan are not public figures or limited purpose (vortex) public figures and are instead private individuals. Therefore, they need only prove a level of fault amounting to negligence on Owens' part, a far lower standard than actual malice. Given the existence of the publicly available

Grand Jury Report and McIlrath Video conclusively establishing that Plaintiffs engaged in zero wrongdoing in connection with Nolan's tragic death, Owens was certainly negligent, at minimum.

129. The Mississippi Supreme Court has addressed the boundaries of when a private individual such as Warren, Jax, or Morgan would become a "vortex public figure," defined as a person who "thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest." *Speed,* 787 So. 2d at 631. Generally, a vortex public figure must prove that the defendant acted with actual malice, *i.e*., having made the statement in question knowing it to be false or in reckless disregard for the truth. *Ferguson v. Watkins*, 448 So. 2d 271, 277 (Miss. 1984); *Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998).

130. However, where, as here in connection with the tragic death of Nolan Wells, an individual is drawn into the public eye solely to defend against false and defamatory accusations, vortex public figure status is not triggered. *Whitten v. Commercial Dispatch Pub. Co*., 487 So. 2d 843 (Miss. 1986). Private individuals do not transform into public figures when they "were drawn into a public forum in an attempt to defend themselves . . . ." *Id*. at 845. There is "no justification for increasing the standard of proof from a showing of negligence to that of actual malice" in such a situation. *Id*.

131. Thus, Plaintiffs are private individuals who need only prove negligence on Owens' part, a standard that is easily met given Owens' knowledge of the Grand Jury Report and the McIlrath Video.

132. As to the fourth element, harm, Plaintiffs need not prove special harm because Owens accused Plaintiffs of guilt in connection with the commission of multiple infamous crimes, or at minimum, accused Plaintiffs of conduct sufficient to give rise to probable cause in connection

with the commission of multiple infamous crimes, thereby satisfying the requirements of defamation *per se*.

133. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined upon trial of this action because of Owens' knowing and reckless publication of the Defamatory X Post.

**COUNT II – FALSE LIGHT INVASION OF PRIVACY**
***(All Plaintiffs v. Defendant Owens)***

134. Plaintiffs reallege their allegations contained in paragraphs 1 through 115 as if set forth fully below.

135. Mississippi recognizes the tort of invasion of privacy by "holding another in the public eye in a false light." *Prescott v. Bay St. Louis Newspapers, Inc.*, 497 So. 2d 77, 79 (Miss. 1986) (quoting *Deaton v. Delta Democrat Publishing Co.*, 326 So. 2d 471, 473 (Miss. 1976)); *see Cook v. Mardi Gras Casino Corp.*, 697 So. 2d 378, 382 (Miss. 1997).

136. Under Mississippi law, "[o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Prescott*, 497 So. 2d at 79 (quoting Restatement (Second) of Torts § 652E).

137. By publishing the Defamatory X Post to his more than 1,200,000 followers on X, where it has received a staggering 140,000 views, 405 comments, 571 reposts, and 2,600 likes, Owens gave publicity to a matter concerning Warren, Jax, and Morgan.

138. The Defamatory X Post unmistakably concerned Warren, Jax, and Morgan and no one else. It prominently displayed their photo directly beneath Owens' own statement "ARREST

THEM IMMEDIATELY!! LIKE YESTERDAY!!" and linked and endorsed the Trent Out Loud Video, which identifies each of them by name, in addition to the photo of each of the Plaintiffs.

139. The Defamatory X Post placed Warren, Jax, and Morgan before the public in a false light: as criminals who murdered their close friend Nolan, tampered with evidence to cover up their supposed crime, and should therefore be arrested.

140. That light was false. Nolan's death was accidental and involved no criminal activity. The Grand Jury unanimously returned a "No True Bill" and found "no credible evidence" that any person who rode to or from Horn Island on the Triton, the Palm Beach, or the Tideline "engaged in any criminal conduct related to the death of Mr. Wells." **Ex. B** at 5.

141. The Defamatory X Post taken as a whole, consisting of Owens' statement, the photo of Plaintiffs, and the linked Trent Out Loud Video, conveyed to Owens' audience the false impression that Warren, Jax, and Morgan are guilty of infamous crimes in connection with Nolan's tragic death.

142. The false light in which Owens placed Plaintiffs would be highly offensive to a reasonable person. Indeed, there are few things more offensive than being held out to the world as murderers, after a Grand Jury has unanimously concluded the opposite.

143. Owens had knowledge of or acted in reckless disregard as to the falsity of the Defamatory X Post and the false light in which Plaintiffs would be placed. As set forth above, the Grand Jury Report and the McIlrath Video were publicly available five days before Owens published the Defamatory X Post, and the Trent Out Loud Video that Owens himself linked explicitly references and discusses the Grand Jury's "No True Bill."

144. As a direct and proximate result of the Defamatory X Post, Warren, Jax, and Morgan have suffered and continue to suffer mental anguish, emotional distress, humiliation, and

fear for their physical safety and that of their families, including as a result of the death threats, face-to-face harassment, and public ridicule described above.

145. Plaintiffs are entitled to compensatory damages, including damages for mental anguish and emotional distress, and punitive damages in an amount to be determined upon trial of this action as a result of Owens' knowing and reckless placement of Plaintiffs in a false light.

## DEMAND FOR JURY TRIAL

146. Plaintiffs hereby demand a trial by jury of all claims and issues so triable.

**WHEREFORE**, Plaintiffs, Warren, Jax, and Morgan, demand judgment against Defendant Owens as follows:

(a) On Count I, an award of compensatory damages in an amount to be determined upon trial of this action;

(b) On Count I, an award of punitive damages in an amount to be determined upon trial of this action;

(c) On Count II, an award of compensatory damages in an amount to be determined upon trial of this action;

(d) On Count II, an award of punitive damages in an amount to be determined upon trial of this action;

(e) The costs and fees associated with this action; and

(f) Such other relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this the 5th day of October 2026.

*<u>/s/ Hon. J. Tyler Cox</u>*
HON. J. TYLER COX
Mississippi Bar No. 105807
TAYLOR AND COX LAW FIRM
1113 Jackson Ave.
Pascagoula, MS 39567
Tel: 228-696-0111
tyler@taylorandcox.com

*<u>/s/ Edward Andrew Paltzik</u>*
EDWARD ANDREW PALTZIK
(*pro hac vice* application forthcoming)
Taylor Dykema PLLC
914 E. 25th Street
Houston, TX 77009
Tel: 516-526-0341
edward@taylordykema.com