# EXHIBIT C

Unofficial Transcript, District Attorney Angel Myers McIlrath, Facebook, (Sept. 21, 2026), https://www.facebook.com/reel/1394444306203117 (last visited Oct. 4, 2026).

Jackson County, after a thorough and exhaustive investigation, your grand jury met last week concerning the death investigation of Nolan Wells and unanimously returned a no true bill.

In addition to bringing prosecutions against the guilty, the grand jury must also exonerate those who have been falsely accused.

The grand jury was comprised of a diverse group of individuals representing a cross-section of our Jackson County community.

A copy of the grand jury report has been filed with the Jackson County Circuit Clerk as required by law.

And a redacted copy of the report is publicly available on our website, Facebook page, and at the circuit clerk's office

I took my oath as district attorney a little over a year after burying my own child.

When I was sworn in I promised to fight for and protect you and your children as I would my own. I meant it then, and I mean it now.

The death of Nolan Wells has devastated our community. Outsiders and influencers have attempted to exploit Nolan's death to divide and create chaos here, but we are better together.

Our community has suffered many tragedies, and I know that in the midst of this terrible loss, hateful rhetoric, in vile speculation, what has been damaged in our community will be restored

The narrative that three white boys and a black boy went to an island and only three white friends returned spread like wildfire.

This was false.

Nolan went to Horn Island on July 4, 2026, with a large group of friends, and while on the island, he connected with even more friends.

There is absolutely no evidence to support the allegations that Nolan's disappearance and death were racially motivated.

Nolan's friends love Nolan. And Nolan loved them.

Nolan chose to stay on the island that day, and there is not a scintilla of evidence to contradict that. The family, the Crump team, and anyone close to Nolan knew that his disappearance and death were not the result of racial hate or violence.

Yet the flames of that narrative, set against the backdrop of Mississippi's terrible history, were fanned by both people who knew the truth and those who didn't.

I cannot tell you how difficult it is observing people create narratives detrimental to our community when I have true knowledge that I cannot legally or ethically share.

But my job requires discipline and restraint. I am responsible for protecting the integrity of active investigations, and I will always make decisions that most faithfully protect and respect the law regardless of circumstances.

That is the difference between an attorney whose duty is owed to an individual client and a district attorney whose duty is owed to the community as a whole.

I strictly and conservatively interpret the laws concerning what I can and should share with the public about a case.

In the death investigation of Nolan Wells, that has meant that our community had to wait.

The grand jury report provides you with a fuller picture of what was happening during that time.

The secrecy of the grand jury is not a veil that we hide behind.

It is a shield that protects the integrity of prosecutions of the guilty and is meant to protect the innocent from the destruction of false allegations.

The grand jury room and the courtroom are where the community sees the work of your district attorney.

That is transparency. Transparency exists in following the law, abiding by it, having reverence for it, respecting the process and having the discipline and restraint to allow the process to take place even when there is public pressure to prematurely speak.

And before I say anything else about what happened in this case, I want to acknowledge something I will never lose sight of.

I know what it is to bury a child. You are vulnerable in ways that are incomprehensible to people who have never stood there. You want answers. You want something to make sense. You want to know why? Why my child? Why my baby? Why now? Why this way?

And oftentimes, more than anything, you want something or someone that you can hold responsible. You are trying to make sense of something that is absolutely senseless. I understand that. And I believe grieving parents should be given grace and space to grieve.

What I cannot accept, and when I cannot ignore, is that false narratives that Nolan's death was somehow racially motivated and that this is a case of another young black man denied justice by a racist, corrupt system, were perpetuated and allowed to spread.

There is not a shred of evidence to support these narratives. Keep in mind all that has transpired publicly as you review the grand jury report in the correspondence I'm releasing in conjunction with this statement.

For example, on July 15, 2026, Nolan's family and the Crump team were shown evidence of Nolan purchasing his own alcohol.

But that fact they chose not to share with the public from our first meeting I extended an open offer to provide the grand jury with any evidence whatsoever that the family wanted them to have including the findings and testimony of their independent medical examiner.

This is not a practice unique to the Nolan Wells case, but this is how I have always conducted business as your prosecutor.

On August 13th, 2026, after the Crump team conducted and released the results of its independent autopsy, and after receiving hundreds of tips, they advised my office that they had no evidence of a crime being committed against Nolan Wells.

Just this weekend, I read where a congresswoman had met with Nolan's family and the Crump team and said that Nolan Wells is another black boy murdered and no one seems to care.

Ma'am, you are wrong.

The Crump team knows this and knows that they are dealing with a district attorney whose unwavering pursuit of the truth gave them all a seat at the table to offer the grand jury any and every piece of evidence they deemed important to this investigation.

Keep in mind that this meeting with the Congresswoman was after the Crump team advised my office they had discovered no evidence of a crime against Nolan, and understand that our investigation was exhaustive.

And our complete investigation was presented to the grand jury.

I also want you to understand that I'm not suggesting that a grieving mother police the rumors surrounding her child's death. What I am suggesting is that the Crump team knew better, but did not do better.

I am giving you the opportunity to see for yourself what was communicated between my office and the crump team.

Releasing the correspondence I sent during the investigation is the written record that provides the clearest account of those interactions.

From the beginning, I told Nolan's family that our goal was the same, to find out what happened to Nolan Wells. This is and has always been a search for the truth. No narrative, no agenda, no politics, nothing personal, just the truth.

One of the most prevalent false narratives was that my office refused to cooperate and or obstructed a mutual examination with the Crump team of Nolan's cell phone.

This could not be further from the truth. You must first understand that the state of Mississippi had no legal avenue to seize and search Nolan's cell phone. Nolan's family received that phone in the very early morning hours of July 5th, and it continues to remain in their possession.

Nolan's family and the Crump team have always been in complete control of Nolan's cell phone, including when, where, how, and if the phone would be examined by the state. During our July 15, 2026, meeting, I accepted the Crump team's offer to participate in a mutual examination of Nolan's cell phone. I remained willing to do so and agreeable to any conditions the family wished to impose. Again, this truth about Nolan's phone was not shared with the public.

When the extraction did not happen within a reasonable time, I reached out to get the ball rolling. We could not wait on the Crump team. I could not allow this investigation to be delayed especially as tensions rose, false information exploded, and threats and harassment continued to escalate

Unbeknownst to me, the family was out of town at that time. Their attorneys reached out, and we subsequently set up a time and place for an extraction to occur. On the morning of the agreed upon extraction date, our law enforcement investigators were contacted by privately retained examiners with Garrett Discovery Inc. advising that the mutual phone extraction would not occur, as they had begun a private extraction the evening prior and it was incomplete. I respected the family's decision for a private examination and requested that they share those results with my office.

On August 28, 2026, the Crump team advised that I would receive the extraction data by FedEx within 48 hours and provided a 14-page Preliminary report indicating the phone had not been accessed by anyone other than Nolan's family, and nothing had been deleted off of the phone since Nolan's last use. I never received the full extraction data as promised, and I never received a complete extraction report of Nolan's cell phone.

After the grand jury convened in this case, the Crump team provided a 282-page selection of reports from Nolan's cell phone, which the grand jury considered.

From the beginning, I advised the family that I would present the report of their independent medical examiner and welcomed his testimony before the grand jury. I again extended an invitation to the family's independent medical examiner to come to Mississippi to examine and review whatever he needed to.

Dr. Roger Mitchell accepted my invitation to come to Mississippi and examine Nolan's internal throat structures at the Mississippi Forensic Laboratory. Dr. Mitchell spent August 30th through September 1st in Mississippi. I allowed him to have full access to the complete investigative file.

We took him to Horn Island, showing him various GPS locations relevant in this case and of course he met with our chief medical examiner. He physically examined Nolan's internal throat structures, and he requested additional histological slides.

Once the histological slides had been prepared, my office shipped them overnight for Doctor Mitchell's review. Doctor Mitchell subsequently testified before your grand jury in this matter.

Another false narrative is that I kept the results of Nolan's autopsy and toxicology from his family. This is false. Shortly after I received the autopsy report, I reached out to Nolan's mother directly, and when she did not respond, I spoke with one of her Mississippi attorneys and shared Nolan's autopsy and toxicology results.

My abiding by the law and not releasing the autopsy and toxicology results to the public in no way impeded Nolan's family or the Crump team from obtaining the results and a copy of the results pursuant to the law.

Here again, another narrative allowed to flourish when my hands were tied in responding. The Crump team knew better but allowed the public to believe, among other false narratives, that our medical examiner withheld Nolan's lungs and stomach when his body was released, that things had been deleted off of Nolan's phone before it was given back to his family, that I refused to cooperate with the examination of Nolan's cell phone, that I refuse to provide Nolan's autopsy results to the family.

All lies, and they knew it.

Today, anyone with an internet connection can become an influencer, take fragments of information, construct a narrative without context or firsthand knowledge and broadcast it to thousands or millions of people with little or no responsibility to the truth or consequences for what they do. Likes, shares, follows, subscriptions, and dollars have become more important than the truth. There was a time when having a

public voice came with responsibility and having to earn your place on the platform. Journalists were expected to be knowledgeable about the subjects they covered, to investigate before they reported, to distinguish fact from speculation, and to pursue the truth without regard to narrative that might generate the most attention.

What we have seen happen in Nolan's case, where lives and reputations have been damaged, is reprehensible. People have suffered. Public offices have been harassed. Witnesses, public officials, and others who are completely unrelated to this case have been subjected to threats of harm and intimidation by an angry mob. We do not have laws that adequately protect people from the conduct we've seen or punish those who engage in it.

The right to speak your mind and give an opinion about any matter you desire is not without responsibility, accountability, and consequences.

I call on our federal and state legislators to pass constitutionally sound legislation to ensure that what we have seen in this case never happens again.

As long as there are humans on the planet, there will be hate. That is not unique to Mississippi. It is unique to the human heart. We have seen that hate directed at our community based on false narratives, lies, rumors, and wildly irresponsible speculation.

The lies that were meant to destroy and divide our community have instead reminded us of who we really are and fortified the bonds that hold this community together.

The Mississippi Gulf Coast is an incredibly special place.

Jackson County is an incredibly special place.

And in so many ways, Nolan was a reflection of the incredible community he grew up in and the people who call it home.